Spalding, J.
This case has once been considered in this court, on a demurrer to the bill of complainant filed by Joseph Neville against the insurance company, (17 Ohio Rep. 192.) The demurrer was. overruled by a majority of the court, (the present chief judge dissenting,) with- leave to the defendants to answer.
*453 ' The cause was remanded to the county, where new parties were made, an answer was filed, with a replication by complainants, and much testimony was taken.
. At the May term, 1849, of the supreme court for Hamilton county, upon full argument, the case was again reserved for the consideration of all the judges, and was continued at the last term of the court, from the intrinsic importance of the questions involved in the controversy.
The bill is filed to compel the defendants to perform their agreement, to insure 10,987 bushels of corn, on the flat-boats Eagle and Clinton, together with advances on the boats, amounting in the whole to the sum of $5,550, and to recover that amount, w.ith interest: a total loss having occurred on the 3d day of January, 1847.
Joseph Neville had a general-policy of insurance, issued by the defendants, whereby they caused him to be insured “ in such sums, and on property from such places, and on board of such vessels, as should he mutually agreed upon between the parties, and indorsed thereon.”
The'negotiations with the company as to this specific insurance, and forming the alleged contract, are contained in the following notes:
No. 1.
Cin’ti. Ex’s®. 12 — 29,1846.
To the Merchants and Manufacturers’ Mutual Insurance Company :
Please effect insurance on 145 bbls. lard, per the'Rockaway, hence to New Orleans, valued at seventeen hundred and fifty dollars, ($1750.)
Also — on interest as may appear, on 'two flat-boat loads of Indian corn, now loading at foot of Smith street, in charge of Capt. Hamilton, hence to New Orleans, supposed quantity about 9,000 bushels: declaration of quantity to be made tomorrow. The policy to cover at least five thousand dollars, *454 and to state loss, if any, on either the lard or the corn, payable to Richardson and Watson, New York.
Yours, respectfully,
$5,000. Joseph Neville.
No. 2.
Oeeice M. & M. Ins. Co.
Cin. Dec. 30, 1846,
Jos. Neville, Esq.:
Sir : — The premium on 145 bbls. lard, valued at $1,750, per Rockaway, is —$8.75. The risk on the corn per fiat boat, if the boats are of the right class and size will be five per cent. The premium on flour, per No. 1 boats, is If. We must be furnished with a survey of the flat boats, by Capt. Pierce, before we can decide upon the risks.
Yours in haste,
A. M. Searles, Sec’y.
No. 8.
Cincinnati, 1 Mo. 1,1847.
To the Merchants and Manufacturers Mutual Insurance Company, Cin.:
I have shipped on board the two flat-boats, Eagle and Clinton, now lying at the foot of Smith street, 4,962 sacks, contain-10,987.16 bushels of corn, which you will please insure hence to New Orleans, including advances on boat, etc., at six thousand dollars. Loss, if any, payable to Richardson and Watson, New York. The flat-boats are in charge of Capt. Edward Efamilton, and surveys to be handed in the morning.
Yours, respectfully,
Joseph Neville.
No. 4.
Joseph Neville, Esq.:
There appears to be an over-valuation on the corn, per flatboats Eagle and Clinton. Our rule is market value and five per cent, added. This is always adhered to. Please let me know respecting it. Yours,
A. M. Searles, Sec’y.
*455 No. 5.
On your terms the corn in sacks cost, - - - - $5,000
And, as near as possible, advances paid for two boats, to be included in the policy, ------ 550
$5,550
No. 6.
We cannot understand how 10,978 bushels corn should cost $5,000, when the market price is but 21c.
The market price and five per cent, is the rule, and we do not feel justified in deviating from it. It may stand insured until Monday, when we should be glad to see you on the subject.
Yours,
A. M. Searles, Sec’y.
No. 7.
Cincinnati Exchange, 1 Mo. 2, 1847.
To Merchants and Manufacturers’ Mutual Insurance Company, Gin.:
In reply to your note, just received, I have to say I am prepared to show that the sum insured on flat-boats, Eagle and Clinton (say $5,550), does not exceed your limits, including my advance on the cost of the boats. On the contrary, I am buyer of a few boat loads more of. such corn, in such packages, at same price, or about the same. I have one flat-boat load from Portsmouth, and expect to load two or three boats more from hence, and your accepting of the insurance of the rest from here is entirely optional with you.
Yours, respectfully,
Joseph Neville.
It will be seen that this correspondence commenced with the letter of Mr. Neville, marked No. 1, and bearing date December 29th, 1846. This was on Tuesday.
No. 3 bears date January 1,1847. & that the five last notes must have been written on Friday and Saturday. It is admitted that No. 7 did not reach its destination until the next Monday. On Sunday the boats were started for New Orleans, and were wrecked the same evening, just below the city of Cincinnati.
*456 The only additional evidence that can have a tendency to aid us in giving a just interpretation to this singular correspondence, may bo found in the following extracts, from the depositions of A. M. Searles, secretary of the company, and .Samuel M. Ilaughton, the factor of Richardson, Brothers & Co., of Liverpool and Belfast, on whose account the corn was shipped.
Mr. Searles, in his deposition, says: “ The offer made on Saturday evening in my note, that the corn might stand insured until Monday, was made after office hours, and was intended for his acceptance as a temporary arrangement, in expectation that the whole matter might be fully agreed upon and adjusted on Monday morning. I was secretary in the defendant’s office, and conducted the negotiations with the complainant, in reference to this matter, myself. I do not know that I was ever informed when the boats would start, but was under the impression that they would not start, in any event, before Monday morning, or until the insurance was finally consummated.”
Mr. Haughton, in his deposition, says, that on Tuesday, the fifth day of January, (1847,) “ I went with complainant to the office of the Merchants and Manufacturers’ Insurance Company, to inquire why an indorsement had not been made on the policy of insurance, etc. The, complainant recalled to Mr. Mitchell’s recollection the conversation which had taken place a few days previous, when he had called with the inspection of the boats, and when he had told Mr. Neville that he took the risk; and had told Mr. Neville to hurry the boats off, as the water was falling. Mr. Mitchell said he recollected having told Mr. Neville this.”
In the investigation of this cause, very many interesting questions have arisen, all of which have been met by the counsel, on either side, with distinguished ability.
But after a most careful and anxious examination of the sub ject, in the opinion of a majority of this court, the whole case turns on the question, whether the contract of insurance was complete between the parties at the time of the happening of the loss.
*457 No one doubts- that if the agreement be' proved to exist, though not in writing, the rights of the assured may be asserted in a court of equity.
' The late chief judge, in pronouncing the opinion of this court, upon this branch of the case, when overruling the demurrer to complainant’s bill, remarks, very properly, that, “ we must look closely into the correspondence between the parties, and see if, from that, the evidence of the assent of both parties to the terms of the agreement be clear and unequivocal.”
“ Mutual consent,” says Chancellor Kent, in his Commentaries, “ is requisite to the creation of the contract; and it becomes binding when a proposition'is made on one side and, accepted on the other.” 2 Kent’s Com. 477.
If we look at the correspondence by the light of this rule, how can we arrive at the conclusion that the parties perfected a contract of insurance ?
Neville, in the first place, makes known to the pompany his wish to effect an insurance on two boat loads of corn, supposed quantity about 9,000 bushels, but the real quantity to be made known on the next day. The policy to cover at least five thousand dollars. This was on the 29th of December, and on the 30th, the secretary replies, that if the boats are of the right class and' size, the risk on .the corn will be five per cent.; but, he says, “ before we can decide upon the risks, we must be furnished with a survey of the flat-boats by Capt. Pierce.”
Thus far there seems to be.no pretension of any contract.
On the first day of January, however, a distinct and definite proposition for insurance is submitted hy Neville to the-company. This was on Friday, and all the remaining- correspondence took place on the same day and the next day following.
In his first noce of Friday, Neville says, you will please insure hence to New Orleans, 10,987 bushels of corn; valuation,, inclusive of advances on boats, six thousand dollars.
*458 The secretary, in his subsequent replies, seems to have his mind entirely engrossed with the excessive over-valuation of the corn. So far from evincing a readiness to close in with the propositions of Neville, he omits to take notice of the fact that, in one of those propositions, the company is asked to take risks upon the flat-boats themselves, and thus violate what is proved to have been, at the time, a standing rule with every insurance office in the city of Cincinnati.
He says, very'promptly, to Neville, “ there appears to be an over-valuation on the corn. Our rule is market value and five per cent, added. This is always adhered to; please let us know respecting it.”
Neville replies: “ On your terms the corn in sacks cost five thousand dollars. That is to say, the market value of my corn in sacks and five per cent, added, is five thousand dollars; but I still wish to insure $550 on the flat-boats, making in the whole, (not six<thousand dollars, as I said this morning,) but $5,550.”
Mr. Searles is still embarrassed with the high valuation put upon the corn, and, losing sight of the $550, put upon the hulls of the flat-boats, says to Mr. Neville, as he closes his office on Saturday night, “ We cannot understand how 10,978 bushels of corn should cost $5,000, when the market price is but 21 cents. We have already said' to you, that the market price and five per cent, is the rule, and we do not feel justified in deviating from it.
“ It may stand insured until Monday, when we should be glad to see you on the subject.”
The learned judge, to whose opinion I have once already adverted, in commenting upon the closing part of this negotiation, says, that at the time the secretary informed Ne-ville that there appeared to be an over-valuation of the corn; that market value and five per cent, added was the rule of the office, “ one thing only was wanting to finish and perfect the contract. That one thing was Neville’s acceptance of this modification of the amount to be insured. He accepted the proposition by his third note: ' On your terms the corn *459 in sacks cost $5,000,’ ” etc. With all deference to the high source whence this opinion emanated, I cannot help the belief that the law allows both contracting parties a voice in fixing the market value of the property to be, insured. And it was doubtless owing to the fact made known to us by the testimony, that the secretary had himself bought corn in the market, on that very day, at twenty-one cents, that he would not consent to the valuation of “ five thousand dollars,” on the quantity stated. A valued policy, and none other, was sought for by the complainant Neville. No valuation of the corn was ever acceded to, expressly or impliedly, by the agent of the company, and consequently no contract of insurance was effected for the voyage. What 'was intended by the words of the secretary, “it may stand insured until Monday,” it may be difficult to determine; but I think his own version of the matter, that he meant just what his words expressed, without any very definite notion in regard to the premium, quite as sensible as the construction which makes his language mean, “ it may stand insured until Monday, for the voyage to New Orleans.” He swears tha-t he had no expectation that the boats would be started from Cincinnati until Monday morning, or until the contract of insurance for the voyage should be consummated, and his testimony is not difficult of belief.
In accordance with the doctrine laid down by Chief Justice Hosmer, in the Ocean Insurance Company v. Carrington (3 Conn. 567), which we recognize as “ sound law,” a majority of this court are clearly of the opinion, that the premium of four per cent, upon $5,550, could not have been recovered against Neville, in case the two boats had proceeded safely to New Orleans, without further negotiation in regard to the insurance.
If right in this conclusion, the complainants cannot recover. Both parties to the agreement must be bound, or neither can be held liable.
It is perhaps unfortunate for the parties in interest, that the loss in this case occurred while time was taken to delib *460 erate'by the defendants. This circumstance, however, cannot be allowed to impair their rights, and make that act binding which, otherwise, would not have been so. In the words of the eminent chancellor of New York, whose laws and whose morals were of equal strength and purity, “ the interpretation of contracts, and the administration of justice, ought to rest on general and fixed principles, and not on views of temporary hardship or expediency.”

The bill will be dismissed.

Avery, J., dissented.